Good morning. May it please the Court and our newest member of the Court, Becky Walker-James, appearing for Appellants Robert A. Schuller and Robert Harold, Inc. With me at council table is a co-counsel Carl Grimmer of Manette, Phelps & Phillips, but I will be the only one arguing today. I'd like to reserve approximately five minutes for rebuttal. Dr. Schuller, after building and devoting his life to the Crystal Cathedral Church and Ministries, has been denied the benefits to which he was entitled from the very organization he built. The district court erroneously adopted CCM, the ministry's position, and limited Dr. Schuller's and RHI's damages under the transition agreement in this bankruptcy proceeding to one year of post-petition damages. There is no dispute that under the transition agreement that's at issue here, Dr. Schuller and RHI were entitled to those payments for the remainder of Dr. Schuller or his wife's lifetime. The only basis for limiting the damages to one year of post-petition was the district court's erroneous conclusion that this was an employment, this was a claim of an employee under an employment contract, determination of an employment contract, which limits damages to one year under Bankruptcy Code Section 502B7. But Dr. Schuller is not an employee, and certainly RHI is not an employee, and the transition agreement is not an employment contract. Further, the district court also erroneously denied RHI's claim as not being a proper claimant, even though they were clearly the recipient of the majority of the damages of the payments under the transition agreement. And I'll address the arguments in that order. First, Dr. Schuller was just simply not an employee under the terms of the transition agreement. Was he an employee prior to the transition agreement being executed? Yeah, we took the position that he was not an employee even prior. There was never any written agreement before that time. But for purposes of this issue and this appeal, it really doesn't matter. He certainly wasn't after the transition agreement. The district court did, I think, find him to be an employee for the bankruptcy court, excuse me. The bankruptcy court found him to be an employee for purposes of work for hire prior to the transition agreement. But in the effect of that. Let me explore that point with you for a moment, because in my preliminary view, I think whether or not he was an employee prior to the transition agreement would seem to me to be pretty relevant in providing the context, because if you look at how he was treated, what he believed his status to be before the transition agreement, then you can view what happened during the negotiation for the transition agreement and interpret the terms of the transition agreement in that context. If he had always been treated as an employee, held himself as an employee, despite the fact that he was the founder and the principal force behind the Crystal Cathedral Ministry, and the transition agreement basically kept almost all of the same terms in place, then how is that not relevant for purposes of understanding what the parties contemplated when they negotiated the transition agreement? Well, the only things that the transition agreement kept in place were the levels of compensation and payments to RHI. The duties changed dramatically under the transition agreement. So the transition agreement, the real purpose of it was to lay out the roles going forward after Dr. Shuler stepped down as senior pastor. So before that time, he had been doing the weekly sermons, and so if he was an employee in that context, that certainly ended at the time of the transition agreement. And the transition was to transition his son into that role, transition Dr. Shuler out into sort of an emeritus role of founding pastor. So the transition agreement very much did change the relationship. So even if he was an employee before, and I would say he did have very similar levels of discretion and a very similar role actually before. However, as far as his day-to-day responsibilities of preaching, for example, those ended at the time of the transition agreement. So there was a big change. And I think one of his functions, like college presidents and law school deans, is to raise money. So he was very successful at that. He was. And now then when he retired or when he left the position of senior pastor, then he continued to raise funds. He did. He did, Your Honor. He continued to do fundraising activities. And so how did he get paid before? He was paid in the same way. He was paid a housing allowance, the housing allowance, then the payments to RHI and health insurance. Before he took the status of senior. He was paid the same way. He was paid the same way. And that was the terms of the transition agreement. And so the Crystal Cathedral was a corporation. I believe they are a non-profit, not-for-profit corporation. Non-profit corporation. Right. And they still are a non-profit corporation. Correct. And now when the transition took place, what was the financial condition of the Crystal Cathedral? Well, Your Honor, at that point in time, they were able to continue payments for some period of time. But in the upcoming years, the payments started to reduce as they started having more trouble. And by 2008, 2009, the organization was starting to have serious financial difficulties. When did he retire or transition? This was at the very end of 2005. The transition agreement was signed in December of 2005, so effectively the beginning of 2006. But this financial trouble started about that time, too. I mean, the money wasn't coming in at the same rate. Well, I think it did continue for some period of time. But within a year or two, and I can clarify that, that's when those payments started to diminish. They did not stop at that time. They didn't diminish at that time. They did continue for some period of time. And it was in the upcoming years between 2005 and 2010 when the payments started to diminish. But he was raising funds. He was raising funds. Was he as successful before the crisis? He was very successful afterwards. I do believe that the success began to diminish both because of the financial downturn in the economy, but also because he wasn't playing as active a role in the church, perhaps. I mean, that may be why, but the donations did go down over time. I don't think – I mean, his donations, his fundraising continued to raise, I think, $20 million for the ministries. But there was some decline in overall donations to the ministries, which did lead to their trouble. If I understand the record correctly, this transition agreement was negotiated in 2005, and they continued paying him at the same levels of compensation for a couple of years before cost-cutting measures were put in place and the payments started to become reduced. And then on the eve of bankruptcy, I take it that they stopped altogether. That's correct, yes. What do you think the record reflects regarding the expectations of the parties when this transition agreement was negotiated? I mean, was there any reasonable dispute that the Crystal Cathedral Ministries expected that he would continue to raise funds for them? He was their principal fundraiser, as I understand it, continued to serve as chairman of the board, continued to do some sermons as his interest in time permits. In other words, that he would maintain his active engagement despite the fact that he stepped down as the principal or senior pastor. He would maintain rendering services to the organization for as long as he was able to do so. Did anybody expect that given that this was his life's work that he would all of a sudden stop working and go into retirement in any common sense of the word? Well, as long as he was able, I think the expectations are reflected in the four corners of the agreement. And what is reflected there is that Dr. Shuler, both parties had an interest in Dr. Shuler having a continued role with CCM. He wasn't going to just go into hiding or go off and abandon this entity that he had worked so hard to create. But that role was really in his discretion and is referenced as his interest in time permits. So the other expectation was that it was going to be up to Dr. Shuler at this point how much he did, how he participated, and to what extent. And there was obviously also an expectation, as he was nearly 80 at the time, that he would not always be able to do that. And there was even an expectation that these payments would continue even if he was not able to, even if his interest in time did not permit. Even after he was dead. And even after he passed away. That's exactly right. He would be a dead employee then. Right. Right. And that's one of the most telling portions of the transition agreement, that it provided for payments even after Dr. Shuler passed away. And in that case, the payments would go to his wife. His wife has actually, sadly, since the briefing, passed away herself. So that provision won't come into play. But the expectation of the parties at the time was that these payments would continue, even after Dr. Shuler was obviously no longer able to perform the services under the contract. So this was not a quid pro quo, you provide these services, we pay you for that. This was an expectation that these payments would continue for the remainder of his or his wife's lifetime. And that was what was reflected in the transition agreement. But to the extent that there was an expectation that there would be services rendered in exchange for a lifetime of benefits, does that suggest that it's closer to an employment contract, which would then be subject to the limitation of the bankruptcy co-provision and a retirement package? Look, even if there were an expectation of some continuing services, that doesn't make it an employment contract. Because under common law agency definitions of employment, the indicia are just not here. One of the indicia of employment, even a person can provide services in return for compensation, even though I don't think that's really quite what's happening here, but that doesn't make them an employee unless there's the most important factor is, does the hiring party have control over the manner and means in which the work is accomplished? And under the terms of the transition agreement, it's clear that CCM did not. They did not direct Dr. Shuler. It was as his interest in time permit, according to his schedule. He could keep an office as long as he desired. So this really clearly put control in Dr. Shuler's hands, not CCM's. So even if there were some expectation that services would continue, that did not render Dr. Shuler an employee or the transition agreement an employment contract. So what would you call it? It was most like a retirement agreement, Your Honor, and I think it's a retirement agreement with a licensing component that defines the party's ongoing roles in a transition. I mean, perhaps it's best labeled as a transition agreement, but I think it's important to note that it does have a lot of similarities to a retirement agreement in that the expectation was that it would continue for a lifetime or to his heir, his wife, should he pass away. And I think the Prospect Hill case from the 11th Circuit is right on point on that, and their analysis is very good. Unlike the employment situation where either it's a bilateral obligation and an employee could certainly go out and find another job, so it would be kind of a windfall if we gave them the benefit of that long-term employment contract after the employment ends. You said you wanted five minutes. And we're running very far over. I will stop now unless the Court wants to continue and reserve the remaining time for rebuttal. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, my name is Todd Ringstan. I'm with Ringstan and Sanders. I'll be appearing today as the only attorney arguing for the appellees. I represent Karen Naylor, who is the plan agent in the case, and Crystal Cathedral Ministries joins in our argument here today. I think it's vitally important when you look at the facts of this case that you keep in mind the purpose of this statute. The purpose, as the case law has indicated, is to limit the claims of key executives, employees who for one reason or another were able to extract long-term contracts, calling for substantial remuneration. Another case says to relieve bankrupt employers of the continuing duty to pay high salaries to officers and owner-managers who had been able to exact favorable terms of tenure and salaries while the business prospered. And those are people who continue to be employees. Correct. That's correct. Not people who have retired. That's correct. And so let's look at the issue of whether he was an employee at the time that this contract was signed. First of all, the issue of whether a person is an employee, this Court has held, the Ninth Circuit has held, is predominantly a factual issue to be reviewed for clear error, and that's in the case Chin v. United States, which was cited by the appellants in their briefs. Judge Kwan, in determining the issue of whether he was an employee, utilized the Reed Standard from the Supreme Court, a multi-part test. He made over three pages of factual findings. The trial itself lasted eight days, so there was substantial evidence that, in fact, He was a W-2 employee his entire tenure, both before and after the transition agreement. He received a W-2 salary from the Crystal Cathedral. He had a tax-free housing allowance that he got both before and after the transition agreement. He had substantial benefits, medical benefits, office, staff, both before and after the transition agreement. Well, tax-free housing, how's that coming about? I mean, did somebody pay the taxes on it? That's only because Congress passed a bill to try to override one of our decisions. It succeeded in overriding immediately in a day or two. Were you on that panel? Yes. We said that they were not entitled to tax-free housing simply because they were ministers, and Congress acted in outrage at the idea that we were being anti-religious and amended the tax code. That's why they get tax-free housing. That's why we've got no audience today. So as a pastor, before the transition agreement was signed, he was entitled to a tax-free housing allowance. After the transition agreement was signed, he continued in his role as a pastor. And after he was dead, he got the same amount, or his wife did, when there was clearly no obligation to perform services. No, that's correct, but that's just compensation. I mean, look at it this way, okay? Imagine an owner-operator of a small, closely-held corporation. The corporation is doing well. They decide, I think I want to provide for myself for the rest of my life. I'm going to sign a contract for life, and that contract is going to provide that I will work as hard and on what projects as I see fit. And the contract is going to provide that my compensation will continue until I'm dead and my spouse is dead, okay? That's clearly the type of contract that's contemplated within 502b-7. I mean, that's the whole purpose of 502b-7. 502b-7 is not dealing with low-level- The 11th Circuit said it's only when you have mutual obligations that you're continuing to perform. Otherwise, you're retired, and that's different. Sure. Under your theory, how would you ever have a retirement or a pension payment after you stopped working? Because you stopped working. Yes. That's the whole point. And the whole point is that this continues after he stops working. No, I understand that, but that's just compensation. I mean, this contract didn't say he's going into retirement and he gets to continue being paid. This contract said he's going to continue to have these duties. No, it didn't say duties. Yes, it did, it did. It says that he has to- he does these things to the extent that he wants to. It doesn't- can they tell him he must raise money and how many hours a year? Well, he'd worked for 35 years without anybody telling him how many hours he needed to work. I mean, any high-level executive typically decides their own hours, even their own projects. I mean, that's not unusual in the world of high-level executives. This statute is not dealing with lower-level employees who have supervisors overseeing their every move. This statute deals with people like Dr. Shuler who are at the pinnacle of the organization and who can decide for themselves not only what they will work on and how many hours they will spend, but to a large extent even what their compensation will be. And in this circumstance, that's exactly what happened. Dr. Shuler crafted an agreement that under that agreement he would continue in a new role, but continue, continue to perform responsibilities. And the compensation for that would be paid over a period of years that, yes, could last beyond his lifetime, but that just means that the compensation is going to be paid out over a period of time. Were there duties? Absolutely there were duties. From paragraph 8 of the transition agreement, to enable Dr. and Mrs. Robert H. Shuler to fulfill these continuing responsibilities, the ministry will underwrite staff and travel for each of them. Paragraph 9. Over time, Dr. Robert H. Shuler will lead the CCM board to an expanded board. And it goes on. Paragraph 11. Tell him when would he be in violation of his obligations? If he ceased working entirely, he would have been in violation of his obligations. I mean, this does say he's going to be doing things. Absolutely. To the extent that he wishes to. No, that only applies to one feature of this contract. Looking at the contract itself, I'm not sure that it provides us the full answers to whether this is a retirement package or an employment contract, because on the one hand, as Judge Reinhart and Ms. James points out, it is as he wishes and at his full discretion. And on the other hand, the transition agreement does talk about continuing responsibilities, and that seems to be what the parties contemplated. So should we look then to the parties' expectation at the time that the agreement was negotiated and to the history of how he was treated prior to the negotiations? Absolutely. He had worked there for 35 years without an employment contract. No one told Dr. Shuler what to do. They didn't need to. Dr. Shuler was the embodiment of Crystal Cathedral. He was synonymous with the hour of power, with the Crystal Cathedral. Dr. Shuler decided what he did. Very much so. Can you talk about what the record shows regarding the request for verification of employment that was issued in April of 2010? Was that done at the Shuler's request? Yes. It was Arvella Shuler that testified that she did, in fact, submit that request. They were in the process of refinancing their house, and Dr. Arvella Shuler submitted a request to Crystal Cathedral Ministries to verify that he was still employed there. And, in fact, CCM did, in fact, honor that request and submitted that verification. And with respect to this issue of what did the parties intend, Justice Wynne, let me read from Dr. Shuler's own testimony. I don't have the title of justice. I'm sorry. None of us do. Judge Wynne, I apologize. No problem. Here's Dr. Shuler's own words. The transition agreement provided that I would continue in my existing roles as fundraiser and roving ambassador for CCM. What are you reading from? I'm reading from this is his trial declaration. It appears at excerpt of the record, page 665. And he testified, the transition agreement provided that I would continue in my existing roles as fundraiser and roving ambassador for CCM with an appropriate staff and budget to allow me to continue those activities. I also continued as chairman of the board. While the transition agreement did not specify particular duties, I contemplated that I would continue to assist the ministry, as I had in the past, with fundraising and spreading the ministry's message, but with a reduced role as pastor. In addition, I oversaw special events and projects on the Crystal Cathedral campus, many, if not all of which, were funded by special donations or admission fees. So there were his expectations. I missed the last few words. He says, I oversaw special events and projects on the Crystal Cathedral campus, many, if not all of which, were funded by special donations or admission fees. Or admission fees. Or admission fees. Admission fees. Not mission fees. No, admission fees. And how old was he at this point, 80 years old? He was in his mid-70s, I believe, at the time the transition agreement was executed. And the point here is that this was a man who obviously intended, by that agreement, to continue working, to continue performing his duties. I mean, he describes that in detail, what his expectations were. How long did he continue to provide those sort of services that he contemplated after the agreement was executed? Right up to the time of the bankruptcy. In fact, I believe, I know he testified that he prepared an insider compensation request for him. In bankruptcy, an insider employee has to submit what's called an insider compensation request in order to perform duties and continue to be paid during the course of the bankruptcy case. And I know there was testimony that one was prepared for him. I don't recall whether it was ever actually filed. I think maybe they thought better of it. But in any event, he continued performing those responsibilities. And, in fact, as to the responsibilities, this is, again, from the appellant's own evidence. This was the declaration of Charles Smith that was submitted, the trial declaration of Charles Smith, Excerpt of the Record 602, that was submitted by the appellant. In addition to his in-person meetings with significant donors during my employment by CCM, including the period from 2006 to 2010, meaning the period post-transition agreement, Dr. Shurer was actively involved in other fundraising activities as well. By the way, this entire declaration is about all the work that he did during the period following the transition agreement. He continues, not only did he preach regularly on the Hour of Power television program, which served as a significant fundraising vehicle for CCM, he initiated numerous telephone calls, letters, personal meetings with prospective donors. During that time, his fundraising activities for CCM were a high priority in his life. His administrative assistant, Anita Fraun, testified, and this is in her trial declaration, an excerpt of the Record 596. In addition, this is during the transition agreement period, in addition, Dr. Shurer was in the pulpit almost every week, preaching a sermon on the Hour of Power television program. This is not someone who retired. Now, I realize the compensation could extend beyond his lifetime, but what's to stop a key executive from negotiating an agreement that provides their compensation over a period of time, including possibly to their spouse after they're deceased? I mean, that doesn't mean they're retiring. They fully intend to continue performing working. You know, key executives in General Motors, if they wanted an agreement like this, they'd have to give up their job at the company to do it. They might do things to help General Motors, but the title brings the power. I mean, this is not like a regular corporation. No corporation would give somebody who retires as president and says you're still going to have an office and you're going to promote General Motors and you're going to go on a tour for General Motors. That person doesn't have the power that he had before. He can't direct things in General Motors. This is a unique circumstance of a religious figure. You know, it's an unusual thing we now have with all these evangelicals roaming the country, raising millions of dollars. That's a fairly new kind of method of operating a church. But it is a church and it's out of business. So to talk about what a regular corporation could do, no corporation is going to enter into this, give the president the same salary, have him go out and make speeches and say that, well, he's really still the president, because he's not. He can't give orders. He can't determine what cars they're going to build. He can't do any of that. This is not comparable. And the situation you posit wouldn't exist. Not for General Motors. No, not for normal corporations. But, no, well, normal corporations include small, closely held corporations. That's what, no. The large corporation, you're saying Congress was determined to stop these huge corporate gifts and funds. No, you think they were aimed at religion? No, no. I don't think that they were just aimed at huge corporations. I mean, frankly, abuse is more likely to happen in a smaller, closely held corporation. And the effect that has upon the creditors is what bankruptcy code is designed to prevent. I mean, a small, closely held corporation is more likely to be influenced by a key individual, a single individual, who can then negotiate for themselves, or by fiat, give themselves a contract for life or a contract that may extend beyond their life. And that's the kind of role Dr. Schurer had in this organization. But as chairman of the board, he still had voting rights? Absolutely. He continued as chairman of the board. He continued as a member of the executive committee. So he was not walking away from this, nor was he giving up his power. In fact, by changing the role from senior pastor to founding pastor, the only real effect of that would have been that, as senior pastor, it would have been his responsibility to give the sermon weekly. What we see from this testimony is that, in fact, even that continued. The fact of the matter is that Robert A. Schurer, his son, did not continue throughout this entire period of time as senior pastor. And Dr. Schurer, in fact, continued to give the sermon on a weekly basis. But he very much did not give up the reins of this corporation. He very much was still in control and was still the head of this entity. So, no, this is not General Motors. Cathedral Ministries was not General Motors. You're saying this is really not an arm's-length transaction. Well, and I think often you have that in smaller, more closely held corporations. You look at the language. It's a contract that was signed by Dr. Schurer and one of the parties representing CCM. The testimony was uncertain as to whether the board actually ever approved this contract. It was unclear in the testimony at trial whether the board actually approved this contract. I thought that this was negotiated, at least drafted, by CCM's lawyer. Dr. Schurer was the one who was unrepresented in negotiating this transition agreement. Well, I guess the question becomes, was the lawyer representing Dr. Schurer or was he representing CCM? I mean, remember, Dr. Schurer spoke for CCM. I mean, even look at the language of this agreement. It starts out, Dear Dr. Schurer, you have recommended that Dr. Robert A. Schurer be installed as senior minister, and it continues. At the same time, the board of the Crystal Cathedral Ministries, upon your recommendation and with your approval, has agreed to install Dr. Robert A. Schurer as senior pastor. So this, again, the evidence here is, and there was no evidence, that somehow this is something that CCM imposed upon Dr. Schurer. Far from it. So in this case, and again, to the point about compensation, a person can negotiate any sort of compensation, particularly a key executive, and simply because the compensation is going to be paid out over a period of years or even perhaps beyond their death, does not mean that they're not employees, does not mean that they're not continuing to perform duties. Let's assume the senior executive that you're worried about doesn't do any more work. Senior executives, because it's a small corporation, costly health, negotiates a deal that gives them a lot of money for life. Sure. But he has no work to do, no obligations. He's not covered by the statute, is he? I think he would be. I think he absolutely would be. Why? Well, because that's exactly what the statute was designed to prevent. I mean, if it's an employment contract, if the contemplation is that the person's not retiring, that they're going to- No, no, I said the person is retiring. He negotiates this beautiful golden parachute, or whatever you want to call it. You're talking about people who have this kind of power and control. They don't have to work anymore. Okay. And they get the same huge $100,000. It's not that huge anymore. But he gets $500,000 a year, and he leaves the company, and he doesn't do anything anymore. This provision doesn't cover him. If they retire. Yes. You're absolutely right. If they retire, if they leave the company- You're worried about this. where someone's got all the power, giving himself a huge package, and he doesn't do any work anymore. He's not subject to this. It's only if he continues to do the job and continues to do with the small company what he always did. And that's what happened here. Well, that's the question. Yeah. That is what happened. Where you don't have to do anything more. Sure. Yeah. Okay. This is in between. If a person's retiring, okay, and they leave the company, sure, the statute doesn't apply. But in a circumstance where the- Give themselves $100,000, $500,000 for life, and then they leave their small, closely held company. And even the appellants don't say he was leaving or he was retiring. They say his role was changing in the company. So he certainly had- The real question in this case is it's a very unusual kind of a case. And it has to do with the kind of way somebody who is the founding father of an institution, whatever it is, only a religious institution, he's the founding father of that, if he stops working but still agrees he's going to help the institution, is he retired or is he still an employee? It's not like any of the other tax cases. Right. It's not like the cases that distinguish whether he's an independent contractor or an employee. This is really a unique type of case. I do agree with you, Your Honor. I would just point this out. In this case, he wasn't stepping away. All he was doing was installing his son as the regular pastor, which bears the title senior pastor. And then he carved for himself a very specific and continuing role. And you're talking about non-profit, too. Yes, we are talking about a non-profit, different situation. Very non-profit, as it turns out. Yes, very non-profit. I think I've used all my time, unless the Court has any other questions. Let me ask you, I'm just curious about one thing. You know, when I grew up, I was born in this city. We had three voices on the radio. Well, there were more than three, but there was Amy Semple McPherson. There was Rabbi Magnin. And there was Bob Shuler. Now, how are they related? How are they related? Is this Robert Shuler's father? No, I think that was Dr. Robert Shuler. No, that couldn't be. I don't know, actually. No, actually, I was thinking of my own childhood in which, you know, Sunday mornings, the Hour of Power was on. So I don't know. I've never heard that, in fact, his father preceded him in the ministry. I've never heard that before. And this particular church. I don't know the founder. Yeah. He is the founder of this church. That's correct. But there was a Bob Shuler. Yeah. I do not know whether or not there's a relationship. And there was Reverend Fifield. Well, Fifield is a different one. I don't know. Thank you very much, Your Honor. Do you know the answer to that? I don't, Your Honor. I'll have to. What did they say? They said I'll have to Google it. Right. You might. Yeah, I don't know the answer to that question. I'm safe from doing the math because I can't recall offhand. How old is Dr. Shuler at this time? I believe he's 80. He's in his late 80s. Let's see. He was nearly 80 in 2005. So I believe he is 80, about 88, 89 at this point. Young fellow, Harry. Is he still with us? Yes, he is. He is. His wife is not, but he is. I would agree, Your Honors, that this is a very unique contract, a very unique situation. And I think I'd just like to address a few points that counsel made. Talking about the purpose of the statute for these key employees, given this unique situation, I think it is clear that nothing here frustrates the purpose behind 502B7. And really, when we look at the, again, coming back to the Prospect Hill case that describes the situation of a retirement contract, a retirement agreement, excuse me, the policy there of not having an employee who has continuing employment obligations to sort of get the windfall of getting a lifetime of compensation when the employment ends doesn't apply in the case of a retired employee. And in the case of a retired employee, subject to retirement benefits, those, they've done their work, as the Court said, they've done their work and earned their retirement. And that's the situation here. Basically, you know, whatever Dr. Shuler did from the transition agreement forward, he was going to be entitled to payments for the remainder of his life. And that was, he was obviously in recognition of his many years of service to the church and the ministry. And so that is a different situation where the retirement benefits are vested. The other purpose that's underlying some of this is the concern about not, you know, making an organization unable to reorganize and pay off other unsecured creditors. This situation is also very unique in that the creditors, unsecured creditors in this case, have all been paid under the plan, their principal. So we are not looking at a situation where, you know, paying this claim works to the detriment and makes it unable, makes the organization unable to reorganize. Well, what is the status of the organization today? They continue in operation. They're reorganized through the bankruptcy. They have paid off the principal claims of all the creditors. The only thing that is being held up at this point is interest. And that's a very unusual situation. It's very unusual that all unsecured creditors be paid in full. But they have in this case. But they are continuing to operate. Will the effect of affirming this decision mean that he, his wife's not dead, but that he will not receive any compensation? Right. The only compensation that he was allowed by the bankruptcy court has been paid. But he would not receive anything further. If he had just stopped helping the church, he could have received compensation that would have recognized what he did for the church. But because he performed some services, he now can't get anything. Well, that may be the irony of it, Your Honor. That's the irony of CCM's position here, which is, you know, they rely on the fact that he did all this good work for CCM. He continued to fundraise. He continued. He, in fact, donated money that he earned even for his own speaking engagements back. But the fact that he continued to do work is now being used against him to say, oh, he was an employee. But that's not the right analysis in any event. But where is the money going to come from? Well, there are funds available to pay the claim. As I said, the impact would be on probably the money available to pay interest to other creditors as well as Dr. Shuler. But there are some funds available to pay the claim. But what's the church doing? Is it still operating? Has it gone out of business? It's still operating. They did have to sell, ironically, sell the Crystal Cathedral, but they are continuing to operate. Are they still giving sermons? I believe it's still going, yes, Your Honor. So through the sale of the Crystal Cathedrals and other assets that they had, the organization is now able to be in the flat? Is that where the money is going to come from because it's now no longer operating at a loss? Well, right. The main reason was the sale of this very valuable real property. So because they were able to do that, because they had such a valuable asset, they've been able to pay all the principal on the allowed claims. If the court, over my time, if the court has no further questions, we would just. So how much money do they have now? Well, Your Honor, I'm not entirely sure. That hasn't been fully litigated yet, but there are some assets that are available. There are some mechanisms available to CCM to be able to pay. This would all be a matter of public record, wouldn't it? If you have a nonprofit, don't you have to file a lot of statements with the state? It may be, Your Honor, I'm just not certain of the figure as I stand here today, but I do know that there are assets available. There are, in addition to cash that's been held in reserve because of the uncertainty of this claim, as well as some assets that I think could continue to be liquidated or cashed in, a loan that could be called, that kind of thing. There are assets to be paid. I'm not sure that there would be enough to pay this claim in its entirety, but that also the issue of the amount of the claim has not yet been litigated. Well, has anyone figured out the present value of the claim? Well, our position is that the value of the claim is approximately $3.8 million. But, again, I think the CCM would. . . What was that figure? $3.8 million. $3.8 million. Right. We have expert testimony in the record to that effect. But CCM has not put in their expert on damages yet. If this case goes back on remand, they would have the opportunity to present evidence on that issue. If the Court has no further questions, we can submit. Thank you, Your Honor. Thank you.
judges: Pregerson, Reinhardt, Nguyen